IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, NORTHERN DIVISION

| | |
|---|---|
| GIL A. MILLER, as Receiver for IMPACT PAYMENT SYSTEMS, LLC, and IMPACT CASH, LLC,<br><br>Plaintiff,<br>v.<br><br>J.R. COOK, as individual,<br><br>Defendant. | **MEMORANDUM DECISION and ORDER GRANTING RECEIVER'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:12-CV-00063-DN<br><br>District Judge David Nuffer |

Defendant J.R. Cook (Cook) invested in Kenai, an affiliate of Impact Payment Systems, LLC and Impact Cash, LLC (together, Impact). Impact was ostensibly in the pay-day loan business. On March 25, 2011, in *SEC v. Clark*, Impact was put into Receivership and the plaintiff was appointed as Receiver.[1] Relying on the Utah Uniform Fraudulent Transfer Act (UFTA),[2] the Receiver seeks to recover the amount Cook received from Impact in excess of his investment.[3] The Receiver filed a motion for summary judgment.[4] Cook's response[5] fails to raise a genuine issue of material fact. This order grants the motion for summary judgment, declaring that Cook must return to the estate the amount he received from Impact in excess of his initial investment, plus pre- and post-judgment interest.

---

[1] Case No. 1:11-cv-46-DN (Impact Payment Systems, LLC and Impact Cash, LLC are named defendants).

[2] Utah Code Ann. § 25-6-1 to -14.

[3] Complaint at 4–5, docket no. 2, filed March 2, 2012.

[4] Amended Motion for Summary Judgment and Memorandum in Support (Motion), docket no. 25, filed March 13, 2014.

[5] Motion in Opposition to Amended Motion for Summary Judgment (Opposition), docket no. 26, filed April 3, 2014.

## UNDISPUTED FACTS[6]

1. This Court has already determined that Impact was operated as a Ponzi scheme.

2. Gil A. Miller was appointed as Receiver in this matter on March 25, 2011.

3. The Receiver has concluded that Impact was operated with the characteristics of a Ponzi scheme.

4. The Receiver and the accountants working with him conducted a thorough analysis of Impact's business operations and its accounting records. They relied on the contemporaneously kept records at Impact and on bank records obtained by subpoena.

5. Impact commingled investor funds through intercompany and inter-account transfers.

6. Impact's financial records were not audited by a reputable accounting firm.

7. Although Impact purported to maintain balance records for each investor, those records were inaccurate. According to an e-mail from one of the accounting employees at Impact, many of the investor accounts should have had negative cash balances. At the time of the e-mail, August 9, 2010, there was a total negative [investor account] balance of more than $8.3 million.

8. In order to make distributions to investors who had a negative balance, Impact's accountants would book entries in the accounting records labeled as "temp loans," effectively taking money that had been accounted for as belonging to one investor and

---

[6] Unless otherwise footnoted, the following factual statements are from the Motion and are undisputed by Cook. Bracketed material is added for clarity.

paying it to another. In reality, no transfer of funds was necessary as all of the money was in a single account.

9. Tori Jackson, who filled an accountant position at Impact, testified that distributions were sent to investors when companies [associated with Impact] had negative balances.

10. Impact Payment Systems had losses totaling $1,056,055 as of December 31, 2009.

11. Impact and its related companies did not show an operating profit in any year when distributions to investors were made. The Impact entities realized a collective net loss of nearly $3 million during that time. Nevertheless, they distributed over $52.6 million.

12. Kenai is "a related company to Impact."[7]

13. Funds invested in Kenai went from Kenai "directly into Impact."[8]

14. Cook invested in Kenai.[9]

15. The Receiver allowed Cook's investment in Kenai but refused to accept his alleged total investment amount of $150,000.[10]

16. Douglas Croxall [a manager at Kenai] recalls in his deposition that Cook's investment was as much as $150,000 [in Kenai].[11]

---

[7] Opposition at 2.
[8] *Id.* at 13.
[9] *Id.* at 11.
[10] *Id.* at 12.
[11] *Id.*

17. Croxall and [TR Gourley, another manager of Kenai,] determined they would no longer raise money with Kenai, and [Cook's] investment was commingled with funds in Impact.[12]

18. The money returned to Cook came directly from Impact.[13]

19. Emails to Tori Jackson in April of 2010 and Douglas Croxall in February of 2009 show that Cook requested payment to the account #2316008 at Capital Community Bank.[14]

20. Cook received multiple transfers of funds from Impact.[15]

21. Dirk Pace, an Impact accounting employee, testified that since he was hired by the company in September 2008, it recorded a loss each year and used investor money to cover those losses.

22. One of Impact's accountants, Brandon Cowley, testified in his deposition that new investor money that was supposed to be used to fund payday loans came into Impact accounts and left the accounts within the same week to pay out old investors who had requested dividend payments or liquidation proceeds.

23. Impact used investor funds that were supposed to be used for payday loans to cover expenses.

24. One person, Scott Clark, was principally responsible for Impact's operations.

25. Impact used investor funds to support Mr. Clark's standard of living.

---

[12] *Id.*

[13] *Id.* at 13.

[14] *Id.*

[15] *Id.* at 16 (table identifying the date and amount of each transfer).

**MATERIAL FACTS PURPORTEDLY IN DISPUTE**

To avoid summary judgment, Cook asserts that the Receiver miscalculates and misattributes Cook's contributions and returns.

1. The Receiver argues "Mr. Cook Invested $200,000 in Impact."[16] Cook disputes that amount, arguing he personally only invested $150,000 and a company he managed invested $100,000.[17]

2. The Receiver argues Cook "received $263,000 from Impact. He therefore received $63,000 more than he invested."[18] Cook "disputes that the amounts transferred to him were in excess of his investment,"[19] and states he "did not receive $63,000 more than he invested."[20]

**THE RECEIVER'S EVIDENCE SUPPORTS SUMMARY JUDGMENT AND COOK'S EVIDENCE DOES NOT EFFECTIVELY OPPOSE IT**

**I.    The Receiver shows Cook invested $200,000 and received $263,000 in return**

According to the Receiver, Cook made his first $100,000 investment on May 30, 2008, and his second $100,000 investment on February 17, 2009.[21] The Receiver also alleges Cook eventually "received $63,000 more than he invested."[22] The Receiver relies on the records and declaration of the forensic accountant David N. Bateman. Bateman states,

> We have obtained bank records related to 308 separate bank accounts. We have obtained accounting records maintained in 269 separate QuickBooks files. We have extracted this electronic data and compiled it in a database,

---

[16] Motion at 2.

[17] Declaration of J.R. Cook at ¶ 6–9, attached as exhibit 1 to the Opposition, docket no. 26-2.

[18] Motion at 2.

[19] Opposition at 4.

[20] *Id.* at 5.

[21] Receiver's Reply in Support of Motion for Summary Judgment (Receiver's Reply) at 5, docket no. 27, filed April 17, 2014.

[22] Motion at 2.

> which now consists of approximately 993,600 contemporaneously recorded transactions. . . . This data can be summarized and analyzed in its current form. I believe the work that we have performed to date provides a sufficient basis for my statements.[23]
>
> Impact's records indicate that Cook invested a total of $200,000 with Impact.[24]
>
> Impact's records also show that Cook received payments totaling $263,000 between October 2008 and September 2010.[25]

Bateman attaches to his declaration a Claim Analysis. The Claims Analysis shows each transfer to Cook, starting October 15, 2008, and ending September 10, 2010. The first six transfers are to a Capital Community Bank account ending in 6008 and twenty-three of the last twenty-four transfers are to a Central Bank account ending in 2981. One transfer is made to a Wells Fargo account.

According to Bateman, there is no record of anyone other than Cook investing any part of the $200,000 investment;[26] there is no record of Cook's total investment being composed of anything other than two $100,000 investments;[27] and there is no record of anyone else receiving the $263,000 disbursement Batemen attributes to Cook.[28]

## II. Review of Cook's evidence allegedly supporting his argument that he invested $150,000

Cook argues he personally invested $150,000 and a company he managed invested $100,000.[29]

---

[23] Declaration of David N. Bateman at ¶ 3, attached as exhibit A to the Receiver's Reply, docket no. 27-1, filed April 17, 2008.

[24] *Id.* at ¶ 4.

[25] *Id.* at ¶ 5.

[26] *See id.* at ¶ 4.

[27] *Id.* at ¶ 8–9.

[28] *Id.* at ¶ 5.

[29] *See* Opposition at 2.

Cook claims his personal investment of $150,000 occurred in three separate phases.

> [I]n February of 2009 . . . I decided to personally invest in a new division of Impact . . . called Kenai . . . .[30]
>
> . . . . I subsequently wired an [Impact] account . . . $100,000 on February 17, 2009.[31]
>
> I later gave TR [a manager at Kenai] an additional $10,000 in cash in March of 2009 and paid the remaining amount via a $40,000 check to TR on April 20, 2009.[32]

Because the $100,000 investment he admits to making aligns in both date and amount with the Receiver's records, Cook's dispute only focusses on two issues: 1) the Receiver incorrectly credits him with a $100,000 investment on May 30, 2008 and 2) the Receiver fails to credit him for two later investments totaling $50,000.

Cook provides a personal affidavit to support his first argument. In it he avers, "I was not at a place where I could invest money, however, a company that I was managing at that time decided to invest and wrote a check for [$]100,000 to Impact in May of 2008."[33] He further explains, "The Receiver has been unwilling to recognize the separation between [my] own personal investment with Kenai and the prior investment of $100,000 made to Impact by the company [I] was managing in 2008."[34]

In support of his second argument—that he made two separate investments totaling $50,000—Cook refers to a Subscription Booklet,[35] deposition testimony of Douglas Croxall (a manager at Kenai),[36] a cancelled check,[37] and his personal affidavit.[38]

---

[30] Declaration of J.R. Cook at ¶ 7.

[31] *Id.* at ¶ 8.

[32] *Id.* at ¶ 9.

[33] *Id.* at ¶ 6.

[34] Opposition at 3.

[35] Subscription Booklet, attached as exhibit 4 to the Opposition, docket no. 26-5.

Cook says the Subscription Booklet was given to him to effectuate the deal with Kenai. Under the section describing the purchase and sale of the note it reads,

> The Company [Kenai] hereby agrees to issue and to sell to Subscriber [Cook], and Subscriber hereby agrees to purchase from the Company, a Note in the aggregate principal amount set forth on the signature page hereto. Upon acceptance of this Subscription Agreement by the Company, the Company shall issue and deliver to Subscriber a 24% Unsecured Promissory Note certificate evidencing the obligation in the Form attached hereto . . . , against payment in U.S. Dollars of the Purchase Price.[39]

Cook does not provide the court with the certificate that the booklet says will be issued to "evidenc[e] the obligation." Additionally, the booklet is only signed by Cook.[40] The space provided for Douglas Croxall to sign on behalf of Impact is blank.[41]

Cook also relies on deposition testimony of Douglas Croxall. There Croxall, after asked about Kenai's funding, stated,

> We had two investors or two people who invested money, one was called -- one was a gentleman named J.R. Cook, and he was -- is or was friends with T.R., and I don't recall the exact amount, but it was either 100 or 125 or 150,000, some round number like that, that money -- every penny of that money came in to Kenai Financial and then went directly into Impact.[42]

Next Cook refers to a cancelled check written after his February 17, 2009 investment of $100,000.[43] The check is dated April 20, 2009; is for $40,000; and is written from My Green Tea Extreme, LLC to Global Marketing. It appears to be signed by Cook and endorsed by TR

---

[36] Croxall Dep. Aug. 29, 2011, attached as exhibit 2 to the Opposition, docket no. 26-3.

[37] Check No. 3503 from My Green Tea Extreme, LLC to Global Marketing (April 20, 2009), attached as exhibit 7 to the Opposition, docket no. 26-8.

[38] Declaration of J.R. Cook.

[39] Subscription Booklet at 5.

[40] *Id.* at 14.

[41] *Id.* at 15.

[42] Croxall Dep. 15:24–16:5.

[43] Opposition at 18; Check No. 3503 from My Green Tea Extreme, LLC to Global Marketing (April 20, 2009).

Gourley. In the portion of the check labeled "Memo," someone, presumably Cook, wrote "March Profits."

Cook's only support to verify an additional $10,000 cash investment is his personal affidavit: "I later [after the February 17, 2009 wire transfer to Kenai for $100,000] gave TR an additional $10,000 in cash."[44]

### III. Review of Cook's evidence allegedly showing he did not receive funds in excess of his investment

Cook "disputes that the amounts transferred to him were in excess of his investment."[45] His supporting arguments are the following: 1) "The financial records of Impact were incomplete, disorganized, and inaccurate"[46] and were thus unreliable sources to determine the amounts of specific investments and returns; and 2) the bank statements from his personal account show that the money he received from Impact was far less than the Receiver alleges.[47]

For his first argument Cook relies on the deposition transcripts of four, former Impact employees. For example, one states, "we tried to determine who had ownership of what in the company. And there were a number of conflicting lists of owners and investors and what they owned and what they didn't own and that along with the fact that we couldn't get any of the accounting to match."[48] And another reads,

> Q [Receiver's attorney]. Did you attempt to go back to bank statements to tie investments to specific checks or wire transfers?
> A. Yes.
> Q. Were you able to do that?
> A. In a lot of cases we were.
> Q. You were?

---

[44] Declaration of J.R. Cook at ¶ 9.

[45] Opposition at 4.

[46] *Id.* at 17.

[47] *Id.* at 5.

[48] Asplund Dep. 119:20–120:1, Dec.. 22, 2011, attached as exhibit 9 to the Opposition, docket no. 26-10.

A. Yes.[49]

To support his second argument, Cook compares his bank statements[50] to the forensic accountant's Claim Analysis. Cook states, "As evidenced by the bank account statements, which match the account number that [I] instructed Tori Jackson and Doug Croxall to send payments to in an email, there is no record that an amount totaling $63,000 above [my] investment was received."[51] The bank account statements are all from Capital Community Bank. The first statement is dated October 15, 2008, and the last is dated September 1, 2010. Within that range, the statements show Cook receiving monthly transfers from Impact starting October 15, 2008 through March 16, 2009. Each transfer is for $2,000. While Cook never explicitly states what should be inferred from these statements, he seems to suggest these six transfers totaling $12,000 represent the entire amount he received from Impact.

## DISCUSSION

### I. Standard for Summary Judgment

Summary judgment is appropriate if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[52] The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[53]

"Once the moving party has properly supported its motion for summary judgment, the burden shifts to the nonmoving party to go beyond the pleadings and set forth specific facts

---

[49] Matthews Dep. 31:11–18, Oct. 7, 2011, attached as exhibit 5 to the Opposition, docket no. 26-6.

[50] Capital Community Bank Records, attached as exhibit 6 to the Opposition, docket no. 26-7.

[51] Opposition at 5.

[52] Fed. R. Civ. P. 56(a).

[53] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670–71 (10th Cir. 1998).

showing that there is a genuine issue for trial."[54] "A 'material fact' is one 'that might affect the outcome of the suit under the governing law,' and a 'genuine' issue is one for which 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[55]

When assessing the evidence presented on a motion for summary judgment the court must first determine if the evidence is admissible and then decide whether it creates a genuine issue of material fact. When courts are "assessing a conflict [of fact], [they] will disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue."[56] Similarly, the Supreme Court adds that

> the judge's function [at the summary judgment stage] is . . . to determine whether there is a genuine issue for trial. . . . [T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted.[57]

Therefore, the opposing party's evidence will not create an issue of material fact if it is inadmissible, an attempt to create a sham fact issue, not sufficient for a jury to return a verdict in its favor, and merely colorable or not significantly probative.

## II. The Receiver Properly Supports His Motion for Summary Judgment and Cook Fails to Show There is a Genuine Issue of Material Fact

The Receiver argues he has met his summary judgment burden by showing there is no genuine issue of material fact under the UFTA—the governing law in this case—and is therefore entitled to judgment as a matter of law. According to the UFTA, "a transfer made . . . by a debtor is fraudulent as to a creditor . . . if the debtor made the transfer . . . with actual intent to hinder, delay, or defraud any creditor of the debtor; or without receiving a reasonably equivalent value in

---

[54] *Sally Beauty Co., Inc. v. Beautyco, Inc.*, 304 F.3d 964, 971 (10th Cir. 2002) (citations omitted).

[55] *Pelt v. Utah*, 539 F.3d 1271, 1280 (10th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[56] *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986).

[57] *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 249–50 (1986) (citations omitted).

exchange for the transfer."[58] The Receiver's burden of proving actual intent to hinder, delay or defraud is conclusively established by proving the entities within the receivership operated as a Ponzi scheme.[59] "[T]he general rule is [that] to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers."[60]

Accordingly, to establish he is entitled to judgment as a matter of law, the Receiver must show there is no genuine issue that 1) Impact transferred funds to Cook in excess of his initial investment, and 2) that Impact transferred funds to Cook with the intent to hinder, delay, or defraud its creditors. The second element can be met by showing Impact operated as a Ponzi scheme.

### i. Impact transferred funds to Cook in excess of his initial investment

Through the expert report and disclosure of David N. Bateman, the Receiver establishes that Impact transferred funds to Cook in excess of his initial investment. Bateman is a forensic accountant that amassed a significant amount of data from Impact. After sifting through and organizing the data, Bateman avers that "the work . . . performed . . . provides a sufficient basis"[61] to identify individual investors, the amounts they invested, and the amounts they received in return. His analysis of the evidence clearly shows Cook invested $200,000 in Impact (two separate, $100,000 investments) and received $263,000 in return (thirty transfers to three different bank accounts).[62]

---

[58] Utah Code Ann. § 25-6-5(1)(a)–(b).

[59] See Warfield v. Byron, 436 F.3d 551, 558 (5th Cir. 2006).

[60] Donell v. Kowell, 533 F.3d 762, 770 (9th Cir. 2008).

[61] Expert Report and Disclosure of David N. Bateman at 12.

[62] Claim Analysis - JR Cook – NC, attached to the Declaration of David N. Bateman.

Cook's attempt to dispute Bateman's findings that he invested $100,000 on May 30, 2008, fails because it is an attempt "to create a sham fact issue" with an affidavit. Cook submits his personal affidavit as evidence to show he did not make a $100,000 investment on May 30, 2008. However, the dates on the bank statements he submitted belie this assertion. A summary of Cook's chronology makes this clear:

> May 30, 2008—Cook alleges that a business he was managing invested $100,000 in Impact.[63]
>
> Oct. 2008–March 2009—Impact transfers $12,000 into Cook's personal bank account.[64]
>
> Feb. 17, 2009—Cook makes what he alleges is his first investment of $100,000 in Impact.[65]

Cook's summary shows he received a return on his investment before actually investing; something unlikely for even the most promising investment. Cook makes no attempt to explain this inconsistency. Also, the accounts listed on the bank statements are his,[66] and as he states in his Opposition[67] and attached exhibits,[68] those were the accounts to which he directed Impact employees to transfer **his** funds.

For the alleged $50,000 investment made after February 17, 2009, Douglas Croxall's deposition, the Subscription Booklet, and the cancelled check are "merely colorable, or . . . not significantly probative."[69] They are insufficient to support Cook's claim of a $50,000 investment

---

[63] Opposition at 11.

[64] Capital Community Bank Records.

[65] Opposition at 11.

[66] *See* Affidavit of Custodian of Business Records in Capital Community Bank Records, attached as exhibit 6 to the Opposition, docket no. 26-7.

[67] Opposition at 15.

[68] E-mail from J.R. Cook to Tori Jackson, an accounting employee at Impact (Apr. 20, 2010, 10:49 AM); E-mail from J.R. Cook to Douglas Croxall, a manager at Kenai, subsidiary of Impact (Feb. 17, 2009, 12:54:35). Both e-mails attached as exhibit 3 to the Opposition, docket no. 26-4.

[69] *Anderson*, 477 U.S. at 249–50 (citations omitted).

made after February 17, 2009. In his deposition testimony, Croxall does not recall the exact amount Cook invested; the monetary range he suggests does not help either party. The Subscription Booklet is unsigned and isn't accompanied by the requisite form certifying the obligation, so it appears preliminary to an investment, not evidence of it. The cancelled check is made to an organization not under the Receivership; it appears on its face to be related to something wholly separate from Impact; and Cook's attempts to make Gourley—the endorser—a representative of Impact are underdeveloped and unsupported. More importantly, Cook never provides admissible evidence that this check ever went to Impact. Finally, for the $10,000 cash investment, Cook's only evidence is his affidavit unsupported by any documentation. Aside from the fact that his affidavit has been undermined by clear contradictions in the record, it is self-serving, and "self-serving affidavits are not sufficient" to preclude summary judgment.[70]

In *Terry v. June*[71] the court granted summary judgment even though the defendant contested the amount of money connected to the Ponzi scheme. The court found that the defendant did "not produce any documentation evidencing such funding or indicating where [it] came from. . . . Such a defense is clearly insufficient for surviving summary judgment, a point in the proceedings where the Defendant must present probative and material evidence."[72] Ultimately, all of Cook's efforts to contest the Receiver's conclusions would be insufficient for a rational jury to return a verdict in his favor.

Cook's effort to cast doubt on the forensic accountant's records is also insufficient to create a genuine issue of material fact. "The Receiver acknowledges that there were inadequacies

---

[70] *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir. 1991). *See also Hogue v. City of Fort Wayne*, 599 F.Supp.2d 1009, 1016 (N.D. Ind. 2009) ("the following statements are not properly included in an affidavit [opposing a motion for summary judgment] and should be disregarded: . . . (3) self-serving statements without factual support in the record") (citations omitted).

[71] No. 3:03CV00052, 2005 WL 3466550 (W.D. Va. Dec. 16, 2005).

[72] *Id.* at *5.

in Impact's accounting records. To resolve this problem, he obtained records from Impact's banks."[73] Bateman never claims to rely on Impact's records alone. In his export report he states that he

> relied on the contemporaneous hard copy and electronic financial and operational records maintained by Impact, documentation obtained by subpoena from the various banks that provided services to Impact during its operation and documentation provided by various investors in Impact (claim forms filed with the Receiver or subsequent disclosure). In addition to these documents, we have relied on testimony from various witnesses who were either deposed or interviewed by the Receiver and his counsel.[74]

Even though Impact's records were unclear at points, the Receiver could make determinations by reaching beyond those records and using tools only available in legal proceedings, such as subpoenas, depositions, and interrogatories.

Finally, Cook's reference to his account statements and the attendant implication that they represent the whole of what he received from Impact is insufficient to create a genuine issue. At no point does the Receiver allege that the total amount was transferred to only one account. He traced transfers from Impact into three separate accounts attributed to Cook. Cook fails to account for or dispute the existence of or deposits into these other accounts.

### ii. Impact operated as a Ponzi scheme

The Tenth Circuit defines a Ponzi scheme as "an investment scheme in which returns to investors are not financed through the success of the underlying business venture, but are taken from principal sums of newly attracted investments."[75] The overwhelming and unrefuted evidence supports the Receiver's assertion that Impact was a Ponzi scheme. Impact commingled funds; used new investor money intended to fund payday loans to instead pay out old investors

---

[73] Receiver's Reply at 8.

[74] Expert Report and Disclosure of David N. Bateman at 5.

[75] *In re M&L Business Machine Co., Inc.*, 84 F.3d 1330, 1332 n.1 (10th Cir. 1996) (citations omitted).

who requested dividend payments; and it was never audited by a reputable financial firm. Brandon Cowley, an accountant employed by Impact, testified in his deposition that Impact used new investor money to pay old investors. Cook fails to dispute any of this evidence that shows Impact was a Ponzi scheme. He also failed to make any claim that he performed services of "reasonably equivalent value in exchange for the transfer[s]."[76]

### iii. Conclusion

The undisputed facts show Cook invested $200,000 in Impact and received $263,000 in return. Impact was a Ponzi scheme. "To the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent transfers."[77]

### ORDER

IT IS HEREBY ORDERED that the Receiver's Amended Motion for Summary Judgment[78] is GRANTED.

IT IS FURTHER ORDERED that the Receiver shall submit a proposed judgment against J.R. Cook in the amount of $63,000, together with prejudgment interest at the appropriate rate through the date of this order, and post judgment interest accruing at the statutory rate.

Signed August 13, 2014.

BY THE COURT

_____
District Judge David Nuffer

---

[76] Utah Code Ann. § 25-6-5(1)(b).

[77] *Donell*, 533 F.3d at 770.

[78] Docket no. 25, filed March 13, 2014.